**Opinion issued June 27, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00988-CV

————————————

## IN THE INTEREST OF J. I. T. AND J. A. T., children

---

**On Appeal from the 311th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-53185**

---

### MEMORANDUM OPINION

Following a bench trial, the parental rights of the mother and father of two young boys were terminated. The parents appeal. The mother challenges the legal and factual sufficiency of the evidence on each predicate finding and the best interest finding. She also challenges the sufficiency of the evidence supporting the naming of the Department of Family and Protective Services as the boys' sole

managing conservator. The father challenges the legal and factual sufficiency of the evidence on each predicate finding as to him and the best interest finding.

We affirm as to the father, reverse as to the mother, and remand for a new trial regarding the mother's parental rights. Regarding conservatorship, we affirm the designation of the Department as sole managing conservator.

## Background

The two children who are the subject of this parental-termination suit are J.I.T. (Jim) and J.A.T. (Jake). When Jim was seven years old and Jake was six, they lived in the downstairs apartment of a duplex with their mother P.M. (Pam), stepfather, J.S. (John), and John's two boys who were roughly their same ages.[1]

One Saturday morning, Jim blew the fire out on two lit stove burners, causing the house to fill with the smell of gas. Pam was frightened and angry. It is undisputed that, in an effort to discipline Jim and teach him that playing with fire is dangerous, Pam decided to place Jim's hands near the heat emanating from a hair straightener. It is also undisputed that the process of holding his hands near the hot plates ended with Jim suffering second-degree burns[2] on both hands. The police were notified, and Pam was charged with felony injury to a child.

---

[1] The parental rights of John's two children are not at issue. John was informed by CPS that his two boys could not live with Pam while the case was pending. He thereafter separated from and then divorced her.

[2] Burn classification is discussed in Mosby's Medical Dictionary as follows:

2

What is disputed is whether Pam intended to burn Jim as she exposed him to the device's heat or if, as she contends, Jim jerked away from her as she held his hands near the hot plates and, in doing so, came into contact with the plates and was unintentionally burned. The trial also focused on whether Pam ever admitted pretrial that she plugged in her hair straightener to discipline Jim and was holding it when Jim was burned and whether her failure to "confess" to this involvement pretrial meant that her parental rights should be terminated. A related trial focus was the Department's reasons for changing the permanency goal, which had been family reunification for more than a year, to seeking termination of parental rights.[3]

---

> Burns are sometimes classified as first, second, third, and fourth degree. First-degree burns involve only a superficial layer of epidermal cells. Second-degree burns may be divided into superficial partial-thickness and deep partial-thickness wounds. Damage in second-degree burns extends through the epidermis to the dermis but is usually not sufficient to prevent skin regeneration. In third-degree burns the entire thickness of the epidermis and dermis is destroyed. Fourth-degree burns are full-thickness injuries that penetrate the subcutaneous tissue, muscle, and periosteum or bone.

*Burns*, MOSBY'S MEDICAL DICTIONARY (9th ed. 2013).

[3] The shift in permanency goals is discussed in more detail later in the opinion. In short, the first assigned caseworker testified that she was the caseworker for more than a year, that she recommended family reunification at all times while she worked the case, and that the service providers concurred in the recommendation. Later caseworkers and the replacement supervisor recommended parental termination and provided three explanations for the Department's change of permanency goal: (1) Pam denied any involvement in Jim's burns until trial when she testified that she plugged in the hair straightener and held Jim's hands near the device but did not intend to burn him, which, in the Department's view, equated to a trial confession; (2) Pam did not "successfully complete" her Plan if she did not

### 1.     *Jim is burned*

Pam, the only trial witness who observed the events surrounding Jim's burn, testified that the burns occurred early one Saturday afternoon, on February 6, 2016, when she, her two sons, and her two step-sons were at home. The boys were playing and watching television; she was doing laundry and preparing for the upcoming school week. Pam's husband, John, was at work.

It was cold outside and the home heater had stopped working that morning. To add some warmth, Pam turned on the back two burners on the stove. She chose the back burners because they were farther away from the children's reach. Pam put away laundry in one of the back rooms and reentered the home's main living area. As soon as she did, she smelled gas. She "panicked" because the gas smell was very strong and she feared an explosion. She and the boys opened windows to air out the house. She asked the boys what happened and was told that Jim blew out the flames on the stove.

Pam, according to her testimony, was still panicked by the danger of the accumulated gas in the house and wanted to impress on Jim—who had melted crayons in the gas fireplace the day before—that fire is dangerous. She took Jim to

confess, pretrial, to her role in the incident to the caseworkers, service providers, and, according to Department supervisor, Roy, law enforcement officials and the criminal court adjudicating criminal charges against her; and (3) Department employees view cases differently and can be expected to change permanency goals as staffing changes.

her bedroom intending to spank him. While in the bedroom she recalled that her grandmother taught her the dangers of playing with fire by holding her hand near an open flame so she could understand that heat emanates from flames and can harm people. Her grandmother did not burn her; she only exposed her to the sensation of heat emanating from the open flame.

She decided to use a similar approach with seven-year-old Jim, but she was too afraid to reignite the stove due to the accumulated gas in the home. Instead, she plugged in her hair straightener and had Jim hold his hands in a prayer position so she could hold them close enough to the hair straightener to feel heat coming from the plates. She held the straightener in her left hand and restrained Jim's arms with her right hand. Jim resisted and moved around. Jim's hands came into direct contact with the hot plates, burning him. She immediately dropped the hair straightener and tried to treat his burn. She apologized for hurting him.

Pam testified that she did not intentionally contact Jim's hands to the straightener. She did not intend to burn him. She never clamped the hair straightener closed around his hands. When she realized Jim had been burned, she immediately dropped the device, ran cold water over his hands, and applied burn cream. The incident caused second-degree burns to the outside of Jim's hands.

Pam testified that she had earlier had been involved in two CPS investigations. The first one was occurred in 2010 when she was the victim of

5

domestic abuse by the boys' father, Ron.[4] The second was in late 2013 when Jim was reported to have a bruise on his cheek. Nothing came of that incident. But after two interactions with the Department, Pam was concerned that the burn incident might cause her to lose her children, so, with that fear in mind, she treated the burn at home without seeking a medical evaluation, lied to the school and later a health clinic about how Jim was injured, and created a fake doctor's note to further conceal the truth.

Pam lied to healthcare professionals about the cause of Jim's injuries. Pam took Jim to the East End Medical Clinic four days after the burns, on February 10, because she did not think they were healing adequately. She told the nurse practitioner, L. Umez, that Jim grabbed her hair straightener. Umez testified that she asked Jim what happened, but he "didn't say anything." The burn had become infected, so Umez provided antibiotics and additional burn cream. Umez testified that she recommended that Pam take Jim "right away" for treatment by burn specialists at Shriner's Hospital. She did not make a report of suspected child abuse to authorities.

---

[4]  The court received evidence that the boys' father, Ron, had vandalized Pam's home and wrote threatening remarks on the walls. Pam said it worried her because she was concerned about Jim and Jake's well-being. At the Department's urging, she entered a domestic violence shelter, after which she did not return to Ron. She testified that she did not resume her relationship with Ron due to her concern for the boys' well-being.

Pam returned Jim to school on Monday, February 15. Jim was wearing gloves to cover his injuries. She lied to the school about why he missed school, claiming it was because of blisters in his mouth. She convinced Jim to lie to the school too. Pam forged a medical release document to indicate that Jim had blisters in his mouth that required antibiotics instead of his true injuries. The Department was notified on February 15, and the police were also notified.

Pam took Jim to a burn specialist, as recommended, but she did not go immediately, and she chose a different facility that was closer to her home. She took Jim to Memorial Hermann on February 18. According to Pam's uncontradicted testimony, the doctor determined that Jim's wounds were healing appropriately. The doctor did not recommend any treatment beyond the ointments Pam was already using. There was no evidence presented during trial that Jim suffered any long-term pain, scarring, impairment, or any psychological harm from his injuries.[5]

Jim was interviewed by the police on February 23. Officer B. Bookman from the child abuse division testified that Jim first offered an explanation of his

---

[5] The Department points to a photograph admitted into evidence showing a large area of skin discoloration across the top of Jim's right hand and a smaller area on his left hand. The photograph is undated, and there is nothing in the record indicating when the photograph was taken. The photograph shows discoloration across Jim's knuckles as well, but other photographs admitted into evidence dated February 17, 2016—eleven days after the burns—do not show discoloration on the knuckles.

injuries that was untruthful. Later during his interview, Jim told her that his mother burned him because "she was upset with him" and that the burns were a "form of discipline." Bookman determined the burns were intentional. Bookman wanted to talk with Pam, but Pam's lawyer recommended that she invoke her Fifth Amendment right of silence.

Pam testified about her avoidance of discussing the details of how Jim was burned. Referring to her criminal defense attorney's instruction not to discuss her matter during the pendency of her criminal charges,[6] Pam said that she never discussed the "details" of the events surrounding the burns to anyone before her trial testimony. By trial, though, her criminal case had been referred to a diversion program that would allow dismissal of the charges against her without a plea or conviction if she timely satisfied all agreement requirements.[7] With the matter in an agreed-disposition state, she testified about what occurred when Jim was

---

[6] Pam's criminal defense attorney, Ron Johnson, confirmed in his testimony that he instructed Pam not to discuss the facts of the matter with the Department or anyone else while the criminal case was pending. He told Pam to give the Department his number; the Department never contacted him. Johnson agreed that the Fifth Amendment grants a right to remain silent, but does not grant a right to speak falsely.

[7] In July 2017, Pam entered into an agreement for pre-trial diversion with the State pursuant to the Pre-Trial Diversion Program authorized by Section 76.011 of the Texas Government Code. The agreement did not contain a plea of guilty or no-contest. The agreement allows her to undergo a form of probation, without a plea, and if she is successful, her case will be dismissed, without a conviction in July 2018.

burned. Pam acknowledged that her trial testimony was the first time she fully disclosed the events.

Despite Pam's denials and avoidance of discussing the issue, according to Department employees who testified, the consensus within the Department had always been that Pam burned Jim and, more specifically, that she had done so intentionally to punish him. Pam was denying her involvement but, according to the Department employees who testified, they all involved believed the allegation from the beginning.

### 2. *The Department begins a short-term intervention*

Working off the allegation that Pam burned Jim intentionally during a disciplinary event, the Department determined its course of action. A Family Based Safety Services investigator, P. Lafleur, was assigned. FBSS focuses on non-judicial intervention with the goal of family reunification. The Department also initiated a parental child safety plan (PCSP) for Jim and Jake. According to the Department's published Resource Guide, a PCSP is "a temporary, short-term out-of-home placement a parent can make when CPS determines that the child cannot safely stay with a parent. . . . CPS may offer the parents the option of placing the child out of the home rather than CPS petitioning for court-ordered removal of the

child."[8] The "primary goal of every PCSP is to keep the child safe until the child can safely return to the parent."[9] PCSPs are used only for "short term and temporary" situations that can be resolved within 60 days with the return of the children to the parent.[10] Under this approach, Pam was able to continue to see her children daily and be involved in their care with supervision.

According to Lafleur, Pam identified a relative to be a caregiver and the children were placed with that relative. Pam continued to have direct—but supervised—access to the children, including picking them up daily from school. Lafleur knew of no problems with Pam's access to the children under this arrangement. The original PCSP placement would have transitioned into family-based services, without the children being removed from Pam, had the initial PCSP relative continued in that role, according to Lafleur.

But that placement "fell apart" within a matter of days because the relative determined she was unable to continue caring for Jim and Jake. The Department then removed the children and placed them with foster parents. Up to that point, Lafleur had no belief that the children required removal. And Lafleur would not

---

[8]    Texas Department of Family and Protective Services, Investigations: Parental Child Safety Placement (PCSP) Resource Guide, available online at http://www.dfps.state.tx.us/handbooks/cps/Resource_Guides/PCSP_Resource_Guide.pdf, at 1.

[9]    *Id.*

[10]    *Id.*

have sought removal from the arrangement had it not broken down due to the designated caregiver backing out of the arrangement.

### 3. The Department removes the children and implements Plan requirements

Pam and Ron were unable to identify a replacement caregiver to continue with PCSP placement. Without a relative to continue the PCSP, the Department obtained removal of Jim and Jake.

The Department adopted a Family Services Plan on April 18, 2016, that was prepared by a Department caseworker, M. Mendez, and approved by her supervisor, J. Dominguez. It designated the permanency goal for both children as family reunification, with an April 2017 target date.[11] The Plan stated that the Department became involved because it

> received a referral alleging physical abuse to [Jim] by his mother. His hands were burned by a hair straightener. The children disclosed they overheard [Jim] scream while [Jim] and his mother were in the bedroom. Mother taught [Jim] a lesson for playing with fire on the stove by having him put his hands in a praying position and used the hair straightener to burn the outside of his hands. [Pam] produced fake documents from the doctor's office when she returned the child to school a week after the incident occurred. [Pam] failed to follow up with medical treatment at Shriner's hospital for his burns.

---

[11] The Plan contains an attachment explaining the significance of the permanency and concurrent goals. The permanency goal, it explained, is "the plan DFPS thinks would be best. If it cannot be done, DFPS also has a backup goal called the Concurrent Goal." The Plan states that Pam's progress would be evaluated concerning whether she had completed her assigned tasks, achieved its goals, and showed an ability to provide for her children's well-being.

11

The Plan noted that there was family support, which was a strength. Additionally, the Department noted positively that Pam "is very close to her children," it is "evident that she loves her children very much," and there are "no significant concerns of the home environment."

The Plan listed multiple concerns about Pam's parenting, including that Pam "may not have knowledge of appropriate discipline methods," "does not take the allegations seriously," and has attempted to "cover up the burn injuries by keeping" Jim home from school and presenting a "forged a doctor's note" that misrepresented Jim's health status. Moreover, there was concern that Jim "has been coached to say his injuries were an accident."

The Plan warned that its purpose was to help Pam provide her children "with a safe environment" and that an "inability to provide a safe environment" could result in parental termination.

The Plan identified "service plan goals," including that Pam demonstrate a willingness and ability to protect her child from harm; learn and demonstrate reasonable discipline to meet the children's needs; actively participate in therapy to understand how her own abuse/neglect as a child may impact her current parenting style; and actively cooperate in fulfilling the agreed upon safety plan in order to control the risk of abuse or neglect.

12

The Plan also included a series of required "tasks and services" by the mother, which were grouped into the areas of cooperation, family visits, employment, psychosocial assessment, and parenting. Under cooperation, Pam was required to "actively participate in all Permanency Conferences, court hearings, family visits and activities that are centered for her children . . . [and] cooperate with her current criminal case . . . ." Under psychosocial assessment, Pam was required to complete an assessment, "provide honest and accurate information to the service provider," and follow provider recommendations. For parenting, Pam was required, among other things, to "actively participate in, and successfully complete six to eight week parenting classes" and "demonstrate learned behavior."

An April 2016 court order adopted the Plan and placed the children in the Department's managing conservatorship but granted Pam supervised access to her children at agreed times. Accordingly, the Department had until April 2017 to resolve the conservatorship suit and related issues under a statutory deadline.[12]

Dominguez, who was the original supervisor assigned to the case, testified that the Department believed, from the beginning, that Pam had burned Jim with a

---

[12] Section 263.401 of the Family Code provides that the trial court's jurisdiction ends after one year unless the court "commences the trial on the merits" or grants an extension. TEX. FAM. CODE § 263.401(a)–(b). The extension requires a finding that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). The parties may not extend the deadlines by agreement or otherwise. *Id.* § 263.402.

flat iron and that she did it intentionally. The services that the Department deemed appropriate and that were offered to Pam were based on this belief. This testimony was echoed by the original caseworker, Mendez, and the last caseworker, A. Edwards. Dominguez also testified that the services selected by the Department were intended to address the reason the children came under the Department's care so that the children could safely return to Pam.

### 4. *Pam is criminally charged and is denied access to her children*

In April 2016, the same month the Plan was implemented, Pam was charged with felony child abuse. One of the stipulations placed on Pam by her bond provider was that she have no contact with the complainant. A Department supervisor, N. Roy, testified that Department employees misunderstood the bond condition and believed it was an order from the criminal court prohibiting Pam from having any visitation with the children. Accordingly, almost immediately after the trial court indicated that Pam would have supervised access to Jim and Jake, the Department denied Pam any visitation to her children.

Roy and C. Johnson—the caseworker who replaced Mendez—agreed that the Department was incorrect in its belief that there was a court order preventing Pam from visiting with Jim and Jake and in denying Pam visitation for eighteen months. Roy testified that, when she found out there was no court order, "I was just like, Oh, wow" because "I wasn't aware that there's a difference between a

14

court order and a bond condition." The Department did not accept any responsibility for this mistake. Roy, instead, insisted that Pam always had options "if there was an issue" with being denied visitation, such as calling a supervisor or going "up the chain of command through CPS."

Pam testified that she repeatedly tried to visit her boys while the case was pending, but Department workers always said that there was a court order preventing it. She did not learn until the month of trial that the Department was mistaken. Since the boys were placed under the Department's care, she only saw them three or four times, including once shortly before trial. Pam nevertheless continued to work towards completing the services listed in her Department Plan.

### 5. *Pam is told by the Department she has completed the required services*

The original caseworker, Mendez, testified that, during the year when she was the assigned caseworker, Pam did what the Department asked of her.

The service provider who performed the Plan's required psychosocial evaluation. S. Hand, a licensed clinical social worker with the Children's Crisis Care Center (also referred to as 4Cs), noted in her written report that the Department's referral to 4Cs included a sworn affidavit that Pam had gotten angry at her boys and had "used a hair straightener to burn" Jim's hands. The Department's affidavit further reported that Pam submitted a doctor's note that "appeared to have been tampered" and that the clinic, in response to the school's

15

inquiries, said Jim was seen for his hand burns, "not for anything to do with the mouth." Finally, the Department informed 4Cs that Pam had "not cooperated" with either the police or the Department "to address" Jim's burns.

Hand's evaluation stated that Pam claimed "she was not in the room" when Jim's hands were burned. Pam denied to Hand that she wrote a fake doctor's note. Hand testified that she knew the Department had accused Pam of intentionally injuring Jim. Though Pam told Hand a different story, Hand made a number of recommendations for Pam that she felt "adequately addressed all of the problems" raised in the Department's investigation. The written recommendations, which were approved by Hand's supervisor, another licensed clinical social worker, were "made so that the parents can learn something to make sure they can provide a safe and stable environment for their children." The recommendations included "everything" Hand "could think of" so that Pam could provide a safe and stable home environment for her children.

According to Hand's 4Cs report, a "standard family assessment interview" was performed, and Pam answered Hand's questions. This is considered "self-reported" information. The form states that the "impressions, conclusions, and recommendations given regarding this family are based on the information provided by the parent, the direct observation of the interviewee by the clinician, and the case history."

16

Hand described Pam as cooperative. Pam disclosed that she had been charged with injury to a child and stated that her criminal defense attorney advised her not to discuss with the police the details regarding Jim's injury. Hand confronted Pam with the Department's allegation that all four children in the home reported that Pam burned Jim hands because he "had been playing with the stove," took him into her bedroom, burned his hands, and said, "This is what happens when you play with fire." Pam became "tearful when discussing the allegations." Hand noted that Pam "appeared . . . very concerned about all of her children." Pam also became fearful while expressing her fear that she would not be reunited with her children.

Hand noted a number of "family strengths," including that Pam had participated in the 4Cs assessment, was employed, had completed most parenting classes already, stated that she would cooperate and comply with Department requirements, expressed love and commitment for her sons, and reportedly acted protectively of her sons in the prior Department case when the boys' father, Ron, was accused of assaulting her.

The evaluation's "summary and clinical impression" section noted that Pam had denied causing Jim's injuries and stated that, to work toward family reunification, Pam needed "to actively participate in, and complete, all services provided for her." In addition, she needed to "accept responsibility for the reason

17

her children are currently" in the Department's care and "make the changes necessary to reduce the risk of abuse and neglect in the future." Specific recommendations included random drug tests, individual counseling to address her "role and responsibility" in the case, and parenting classes to learn appropriate "discipline techniques." Pam should also have "supervised visitation" with the boys "to maintain the parent-child relationship" if the Department's goal was reunification.

In August, Pam received a certificate for completing parenting classes. In September, Pam began individual therapy sessions with P. Lezak, which were completed in January 2017. At the conclusion, Lezak officially discharged Pam from therapy. The discharge summary states that Pam was referred "when allegations were made that she burned the hands of her son" after becoming "angry at her two boys" and that she "used a hair straightener to burn" Jim's hands. The treatment provided was summarized as follows: "Interventions that were used in therapy were protective parenting techniques on alternative ways to discipline, anger management skills, and coping skills in missing her two sons." Her assessment was marked as "much improved," and she was discharged on the basis of "completed" therapy "goals."

Lezak did not testify. Pam's first caseworker, Mendez, testified that Lezak believed that Pam had satisfactorily completed the services, as indicated by

Lezak's completion of a discharge transfer summary in January 2017. Mendez never asked Lezak to provide Pam additional therapy after her discharge.

The second assigned caseworker, C. Johnson, testified that therapist Lezak saw the boys shortly after they were removed from their home and again when they were first placed in foster care. Lezak reported that there had been behavioral problems for the children at the foster home, including fights with the other foster kids, and that the children said they missed their mother. The children also "expressed their desire to return home" to Department employees before Johnson's involvement. Johnson agreed with Mendez that Lezak had recommended that the children be reunited with Pam.

Pam testified that she learned a great deal from her parenting classes and therapy, even without discussing the incident details. Lezak "worked . . . around" her unwillingness to discuss the details of the event and "came up with a plan" to proceed with therapy without discussing the details. Pam testified that Lezak interacted with her as though she had caused the burns. The court directly asked Pam whether "you feel like you have dealt with the cause of the injuries to your son through therapy." Pam responded, "Yes, I have."

In October 2016, Pam signed an apartment lease, which listed Jim and Jake as residents in anticipation that they would be returned to her when she finished her Plan services.

Pam testified that she completed everything the Department asked her to do. To her knowledge, she was eligible for the return of her children, and that is what she expected to occur. Her first caseworker, Mendez, concurred.

According to Mendez, a parent successfully completes services when a service provider discharges the parent from the services. Pam completed all of her services as indicated by her service providers' discharges. In February 2017, Mendez documented that Pam "completed" the "tasks and services" assigned to her in the Department's Plan. Mendez also informed the trial court during a pendency hearing that Pam had completed her services.

### 6.    *Foster care placements are unsuccessful for Jim and Jake*

In an August 2016 permanency report to the trial court by Mendez and her supervisor, Dominguez, Mendez reported that Jim "does not have a relationship with his foster parent and does not seem to have any bond." During the home visits, "the children are in one room watching tv and foster parent in another room watching tv." Jim reported "discomfort in this placement." Mendez reported that the foster parent "only speaks of child in negative view and very rarely has any positive things to say." She made similar comments about Jake's relationship with the foster parent, saying that the foster parent "doesn't express too many positive things about him" and there is not "much of a bond." Mendez concluded that both boys would "benefit from being placed with family." She recommended that the

case's dismissal date of April 2017 "remain in effect," "as it is consistent with" the Plan. The report stated that the primary goal was "relative conservatorship" with a concurrent goal of "family reunification."

In October, the Department reviewed the progress on the children's service plans. The review stated that Jake "has expressed that he misses his mom, dad, and step brothers." He "has been displaying aggressive behaviors in school as he has been in the home." The primary goal remained "family reunification with the concurrent of related conservatorship."

A December permanency report prepared by Mendez stated that the Department's goal was relative adoption with a concurrent goal of family reunification. Mendez reported that Jim was on multiple medications and repeatedly would "act out." The report indicated that Jim's behaviors had deteriorated while in foster care. Examples of bad behavior included "pouring bleach on the caregiver's clothes," "destroying her furniture," requiring "round the clock supervision," and failing to "feel bad about those behaviors." She reported that Jake also was medicated and not comfortable in his foster home placement.

### 7.   *Statutory one-year mark is reached*

April 2017 was the one-year mark for the pendency of the conservatorship suit.[13] A month before that statutory deadline was reached, the trial court extended

---

[13]   *See supra* note 12.

the conservatorship matter to September 2017 and set a new trial date in August 2017.

The permanency goal at the one-year mark continued to include family reunification. Mendez, who remained the caseworker, testified that her recommendation, supported by the service providers' discharges, was that Jim and Jake should be reunited with their mother.

Mendez continued to support family reunification at trial. Mendez provided several reasons why reunification was in the boys' best interest, including that the boys demonstrated a bond and love for Pam, they always asked about their mom during conversations with Mendez, they asked Mendez to let Pam know that they loved their mother, Mendez did not believe that Pam would be a future danger to the boys, Pam completed all services assigned to her by the Department, and the Department placements were unsuccessful.

### 8. *New supervisor is assigned and the Department seeks termination of parental rights*

Mendez's original supervisor, Dominguez, was replaced by Roy in late 2016. Roy signed the Department's May 2017 permanency report, which stated that Pam had "completed" and was "discharged" from individual therapy and had completed an eight-week parenting class. It also stated that the boys were in a new foster home where they continued to report "discomfort" with their placement. Nevertheless, this permanency report removed family reunification from the

22

Department's permanency goals. Instead, the main goal was listed as unrelated adoption and the concurrent goal was listed as related adoption.

Roy was repeatedly questioned during trial about the Department's change in goals. She recommended parental termination. She agreed that she had never asked the earlier-assigned Department employees why they had recommended family reunification. She also never spoke with the investigating police officer or the Department investigator before changing the goal. Likewise, Roy never spoke with Lezak, never spoke with Hand, never spoke with the parenting class instructor, never read the police report, never spoke with either child, never read any progress reports submitted to the trial court, never read any therapy notes, and never read the initial service plan. Roy agreed that the change in the Department's permanency goals from family reunification to unrelated adoption was based, not on changes in the facts of the case, but directly related to a change in case staffing. Roy testified that it is "very common" for a replacement Department employee to change a child's permanency goals.

At other times, though, Roy attributed the change to Pam's trial testimony about events surrounding the burn incident compared to what she was willing to disclose earlier. That explanation is irreconcilable with the timeline of events, though, because the Department had already changed the permanency goals and sought termination of parental rights before trial and before Pam testified. Even if

23

the timing allowed the trial testimony to be a cause of the change, it was unclear how that testimony affected the goal. When asked what new information was revealed that the Department did not already know, Roy responded: "That she admitted to injuring the child." For Roy, Pam's trial testimony revealed Pam had "intentionally plugged" in the hair straightener before she disciplined Jim. When asked, though, if Pam had not testified to intentionally plugging in the hair straightener, would Roy's view still have been that reunification was not recommended, she agreed it would. Further, Roy confirmed that she always believed Pam had intentionally injured her child.

Roy testified that she did not believe that Hand's assessment was reliable because Pam provided false information. Roy also testified that Pam had not been truthful to therapist Lezak in the psychosocial assessment. But when asked whether she knows what Pam told Lezak, she responded, "I don't know . . . ."[14]

Roy testified that, had Pam revealed to the Department before trial what she revealed during her trial testimony, Roy would have assigned additional services,

---

[14] The last Department caseworker, Edwards, testified similarly. She testified that Pam "was not forthcoming about how her child was injured" pretrial, which was "the ultimate thing" Pam should have done. Further, Pam had withheld vital information pretrial only to "essentially . . . confess" during trial to harming Jim. But Edwards also denied any belief that Pam had been untruthful to her therapist, with whom Pam was obligated by the Plan to provide "honest and accurate information."

including completion of "a psychological, a psychiatric" and additional therapy to address proper disciplinary techniques.

When presented with evidence that Pam had completed classes on alternative discipline techniques, Roy testified that the classes could not have been effective because Pam had not acknowledged her conduct. Roy drew a distinction between completing the Plan's requirements and completing them successfully, and testified that Pam "did not" successfully complete the Plan. Roy agreed that "nowhere in this plan does it make any distinction between completing the service plan and successfully completing it." According to Roy, Pam was deficient because she "did not tell the service providers the truth on how the child was injured," and "she denied that she injured the child." Pam's Plan required her to "provide honest and accurate information to the service provider." Roy acknowledged that others in the Department believe Pam successfully completed her services, but Roy disagreed because Pam provided false information.

According to Roy, the assigned supervisor and program director are to meet to determine whether a parent has successfully met Plan goals. Roy testified that she never met with the program director on whether Pam completed her goals. Thus, Roy, alone made the determination that Pam had not.

Roy was asked why she never told Pam that she believed Pam had not successfully completed her Plan though she performed all listed requirements. Roy

testified that she "never" puts into a report that there are concerns about a parent adequately completing services; instead, those concerns would only be expressed "on the record in front of the Judge," even after a report is prepared that says "completed and discharged." According to Roy, parents will learn in the courtroom what the Department's actual position might be. Contrary to Roy's testimony, Dominguez, who was Roy's predecessor, testified that the normal action is for the Department to alert a parent if the Department believes that the parent has not successfully completed the services. Moreover, "the parent should be given an opportunity to work services and be reunified with their children." And, according to Dominguez, if more services are required of the parent, the caseworker should tell the parent.

Dominguez testified that she, as a Department supervisor, "expects" family reunification if the parent completes the services. According to Dominguez, though, different supervisors adopt different permanency goals when facing similar facts.

Dominguez agreed that a parent needs to be forthcoming about how an injury occurred for services to be successful. But Dominguez also testified that the Department always believed that Pam intentionally caused the burns on Jim's hands. When pressed whether Dominguez would have changed the Plan had Pam informed the Department that she intentionally exposed Jim's hands to heat,

26

Dominguez could not confirm that the Plan would have changed based on that additional information.

Roy was asked about the Department's policies on changing goals, as well as the undocumented distinction she was making at trial between "completed" and "successfully completed" Plan services. Roy testified that she was unaware of the Department policies that apply to changes in conservatorship, including that parents must be notified of changes to permanency plans, and she confirmed that the Department "didn't follow the policy" here. She also was unaware if there was any policy concerning (1) whether permanency goals should be considered in any particular order,[15] and (2) the relevant factors for ruling out family reunification as a permanency goal.

---

[15]    The Department agreed during oral argument that we may take judicial notice of the Department's policies as set forth in the *Child Protective Services Handbook*. Section 6233 of the Handbook requires the caseworker to discuss with the children, parents, and other identified individuals the permanency goals before their selection. *See https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_6200.asp.* If a parent disagrees with the selected goals, the caseworker is required to document the parent's reasons. *See id.* Section 6234 requires a caseworker to "consider permanency goals in" a specified "order of priority," with family reunification over all other options. *See id.* Section 6234.1 provides that family reunification is the goal when the Department "has determined that the child's parents are willing and, after completing services, able to provide the child with a safe living environment." *Id.*

Section 6234.16 provides that the Department "may rule out family reunification" in two situations (1) reasonable efforts at reunification were made and the family is no longer willing or able to reduce the risk of abuse or neglect enough for the child to return home and live there safely for the foreseeable future or (2) reasonable efforts to reunify the family are not required because either a court has

Roy was not the only Department employee who testified in favor of terminating Pam's parental rights. The two caseworkers who replaced Mendez and were under Roy's supervision during the last six months of the conservatorship testified likewise. Mendez's initial replacement was Johnson, who was the caseworker from May 2017 through October 6, 2017. She testified that the children were in foster care and that Pam had completed all the requirements of her Plan. Johnson stated that she had never requested any revisions to Pam's Plan. She believed Pam "was trying to cooperate as much as she could without . . . admitting that she actually injured the child" due to the pending criminal matter. But Johnson testified that Pam's failure to admit injury meant that Pam had not fully cooperated with the Plan's requirements.

Johnson recommended that Pam's parental rights be terminated. Johnson's official reason was the pending criminal case.[16] But, at the time of trial, the criminal case had been resolved. Johnson now thought Pam's rights should be terminated because of the injury's "nature," what the kids said about how the burn

determined that reunification is not necessary due to aggravated circumstances or both parents have had their parental right terminated either voluntarily or involuntarily. *Id.*

[16]  A Department "child information report" was prepared by case manager, S. Gates, in May, at the same time Johnson took over as assigned caseworker. It twice stated that Pam had "completed her services" and that the "main barrier at this time is not being able to return the children to her due to her pending criminal charge and not knowing the outcome."

28

occurred, and the mother's failure "to explain why the circumstances happened." Johnson also contended that although Pam had completed the parenting classes, she had not communicated with the Department to show that she had "developed the skills to be a protective parent and understand inappropriate discipline." Johnson admitted, however, that she never told Pam that she expected her to explain that she had learned appropriate discipline methods. Johnson assumed that "there is some kind of requirement or need for" Pam to "admit to intentionally injuring the child," to "show remorse," and to "acknowledge responsibilities for the injuries." Yet Johnson conceded that a Family Services Plan "should never" require or ask "a parent to incriminate themselves" and that she never told Pam that she would not support reunification.

Johnson testified the children exhibited behavioral problems since being placed in foster care. She testified they are lacking in empathy and have issues with authority. Consistent with earlier reports, Johnson's report noted that the "children have expressed their desire to return home with their parents."[17]

The caseworker at the time of trial, A. Edwards, who replaced Johnson, was assigned to the case on October 6, 2017 but did not make contact with Pam until

---

[17] Gates's May 2017 report stated that the children had been moved to a different foster home, where the children's "immediate needs" were "being met." The children, however, "expressed their desire to return home with their parents" and "missed their mother."

29

October 30,[18] over two months after the trial began.[19] Edwards testified that termination was in the boys' best interest "based mostly on the fact that throughout the duration of this petition, the mother has withheld vital information regarding how injuries were caused to the child," which, according to Edwards, "calls question to her truthfulness," as well as "her ability to parent the children successfully" and to use "proper discipline techniques."

Edwards testified that, to her knowledge, no one at the Department had ever told Pam that she did not satisfactorily complete her service plan. Edwards agreed that the Department did not ask Pam to take additional parenting classes or tell her that, in the Department's view, she failed to demonstrate an adequate understanding of proper discipline techniques. Edwards further agreed that the Department "has a duty to inform parents what it takes for them to get their children back" and "a duty to tell parents when they are deficient in their services."

In sum, Roy, Johnson, and Edwards replaced the original Department caseworker and supervisor. While the original caseworker testified that she

---

[18]     There was evidence that Pam was texting Johnson as late as October 12 to obtain information about the case's status and to arrange to visit her boys because she had learned that there was no court order preventing access. Pam was not told that Edwards was the new assigned caseworker as the case was approaching the November trial date.

[19]     Trial briefly began on August 16, 2017 and was continued until the next week. When it resumed, the Department briefly began its questioning of one witness and offered one exhibit. The trial was recessed to November 1. The trial began in earnest on November 13.

supported family reunification, her replacements did not. They indicated that Pam failed to successfully complete her Plan because she did not fully disclose pretrial her role in the events when Jim was burned. Yet the Plan, as written, required honest disclosure specifically to the psychosocial evaluator, and none of these witnesses affirmatively testified that, to their knowledge, Pam had been dishonest with the therapist, who did not, herself, testify. No report from the therapist stated that Pam was dishonest or that her lack of full disclosure impaired her treatment. The discharge summary allowed Lezak the option to specify discharge for "noncompliance," but Lezak instead discharged Pam on the basis of "completed" therapy "goals." Roy was asked whether she knows what Pam had told the therapist, and she responded, "Yeah, I don't know." Edwards specifically denied any belief that Pam was untruthful to the therapist.

According to Mendez, no one with the Department ever said that Pam did not complete the services because she did not tell what happened during the burn incident. In fact, Roy had "signed off" on documents saying that Pam had completed the services. Mendez testified that no one at the Department ever voiced a concern that Pam had to address whether her conduct was intentional to successfully complete the services. In Mendez's view, Pam successfully completed her services, as evidenced by her discharge by service providers and the notes on court-filed documents indicating the services were "completed."

31

### 9. *Evidence regarding Ron's involvement in the children's lives and adherence to the Department's Plan*

The trial court received evidence that the Department created a Plan for Ron as well. Ron had not completed any of the listed services. In addition, he had not seen Jim or Jake for the entire pendency of the suit, nor had he asked about their well-being or attempted to designate a caregiver for them.

Ron testified that he has extreme difficulty with his memory. He could not remember when he last saw the boys, where he lived, or the dates of significant events. He also did not remember being served with process.

### 10. *Rendition*

Immediately following closing arguments, the trial court announced its rendition from the bench. The trial court found "by clear and convincing evidence that the mother has engaged in . . . conduct" that violates Subsections (D), (E), and (E), and that "termination of the parent-child relationship is in the best interest of the children." The trial court likewise found that the father engaged in conduct that violated Subsections (D), (E), (N), and (O) and that termination was in the best interest of the children as to father's parental rights. The trial court found that it was necessary for the safety and welfare of the children and their best interest that the Department be named sole managing conservator of both children. Pam and Ron appeal.

## Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges, duties, and powers with respect to the parent-child relationship except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.* However, "the rights of natural parents are not absolute" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that parents may forfeit their parental rights by their acts or omissions, the primary focus of any termination suit is protection of the child's best interest. *Id.*

Due to the severity and permanency of the terminating parental rights, the State must prove its case by clear and convincing evidence. *See* Tex. Fam. Code. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. This is an

intermediate standard that falls between "preponderance of the evidence" used in ordinary civil proceedings and "reasonable doubt" used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d 351, 358 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). When the legal sufficiency of the evidence supporting the termination of parental rights is challenged, the reviewing court looks at all the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 265–66. The court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. It should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. If, after conducting a legal sufficiency review of the record evidence, the court determines that no reasonable factfinder could have formed a firm belief or conviction that the matter to be proved was true, the court must conclude that the evidence on that matter is legally insufficient. *In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266.

Only when the factual sufficiency of the evidence is challenged does the reviewing court review disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003). The court of appeals should "explain in its opinion 'why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.'" *In re J.O.A.*, 283 S.W.3d at 345; *see In re J.F.C.*, 96 S.W.3d at 266–67.

A single predicate finding under Section 161.001(b)(1) of the Family Code is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, we will

35

affirm on any one ground because only one is necessary for termination of parental rights. *See In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

**Termination of Pam's Parental Rights**

Pam challenges the legal and factual sufficiency of the evidence on each predicate finding and the best interest finding.

**A.      Predicate findings (D), (E), and (O)**

The trial court determined that Pam (1) knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endanger their physical or emotional well-being, (2) engaged in conduct or knowingly placed her children with people who engaged in conduct that endangers their physical or emotional well-being, and (3) failed to comply with the provisions of a court order that specifically establishes the actions necessary for the parent to obtain the return of the child. Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). We begin with subsection (E).

Subsection (E) requires the trial court to find by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional

well-being of the child."[20] *Id.* § 161.001(b)(1)(E). This subsection focuses on whether "the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re M.T.W.*, 2011 WL 6938542, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) (quoting *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

The Department presented evidence that Pam committed acts that endangered her children. Pam's testimony established that, as part of her discipline of Jim for playing with the fire on the stove, she intentionally placed Jim's hands close to a hot hair straightener to cause him to be aware of the sensation of heat. While Pam denied that she intentionally caused Jim's hands to contact the straightener's hot surface, the trial court was free to disbelieve her testimony and conclude that she clamped his hands in the device intentionally. Jim received second-degree burns on the outside of both hands.

---

[20] The parties dispute whether termination under Subsection (E) can be based on a single act or omission or if it requires a course of conduct. The Department points to the language of the statute that says "engaged in conduct" and a recent opinion of this court, *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied), to argue that a single event can be sufficient. Pam relies on a body of cases, including *In re E.N.C.*, 384 S.W.3d 796, 806 (Tex. 2012), that discuss the State's burden of proving "that a parent engaged in an endangering course of conduct . . . ." We need not address whether a single act or omission would suffice because the Department presented evidence of multiple acts.

Moreover, Pam withheld medical care for Jim for four days after the burn. Pam testified that she treated the burn at home and delayed medical treatment only because she was fearful that she might lose custody of her children. Nonetheless, medical care was withheld by Pam, and Jim developed an infection that required antibiotics. *See In re H.M.O.L.*, No. 01-17-00777-CV, 2018 WL 1659981, at *13 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (parent's failure to provide appropriate medical care may constitute endangering conduct for purposes of Subsection (E)).

Pam also intentionally caused Jim to miss a week of school in her effort to hide the burn and, once he did return, Pam intentionally misrepresented Jim's health information to school officials in furtherance of her efforts to hide the incident and Jim's injuries. She also had Jim lie about what had occurred.

Jim's younger brother, Jake, was in the house when Jim was burned. There is evidence that Jake knew Pam was mad, heard Jim scream, and worried that Pam would burn him. Thus the factfinder could have reasonably determined that the incident negatively affected Jake's emotional well-being as well. *See In re A.C.*, Nos. 10-15-00192-CV, 10-15-00193-CV, 2015 WL 6437843, at *7 (Tex. App.—Waco Oct. 22, 2015, no pet.) (mem. op.) (stating that violence to another resident of home can endanger child living in home).

Pam argues that she provided burn care at home, took Jim to the doctor when it appeared the burn might not be healing appropriately and, after that initial appointment, also took him to a burn specialist, who told her that the burn was healing appropriately with the care given. This testimony does not negate the evidence that she delayed Jim's initial medical care, that Jim's injuries were infected when a medical professional did assess his injuries days later, and that she further delayed follow-up medical care when she rejected the recommendation to take Jim to Shriner's Hospital, chose another medical facility, and delayed making the appointment there for several more days.

Viewing the evidence in the light most favorable to the termination, we hold that the trial court reasonably could have formed a firm belief or conviction that Pam "knowingly engaged in conduct" that endangered Jim and Jake and, therefore, the evidence was legally sufficient. *See In re H.M.O.L.*, 2018 WL 1659981, at *13 (parent's failure to provide appropriate medical care may constitute endangering conduct); *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child."); *see also Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child.").

We further hold that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of a finding of endangerment under Section 161.001(b)(1)(E) or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction of endangerment. Accordingly, we hold that the evidence was factually sufficient. We overrule Pam's second issue.[21]

We turn now to the best interest finding.

## B. Best interest

In addition to a predicate violation, the Department must establish by clear and convincing evidence that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(2). There is a strong presumption that the child's best interest will be served by preserving the parent-child relationship. *In re J.F.C.*, 96 S.W.3d at 294; *see* TEX. FAM. CODE § 153.131(b). Because of the strong presumption that maintaining the parent-child relationship is in the child's best interest and the due process implications of terminating a parent's rights without clear and convincing evidence that termination is in the child's best interest, "the best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better

---

[21] Because we have determined that there is legally and factually sufficient evidence to support termination under Subsection (E), we do not reach Pam's challenges to the evidence under Subsections (D) and (O).

and more prosperous parents." *In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.); *see In re E.N.C.*, 384 S.W.3d 796, 809 (Tex. 2012).

A factfinder may consider a number of factors to determine the child's best interest, including the child's desires, the child's present and future physical and emotional needs, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist those people in promoting the child's best interest, plans for the child by those people or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The absence of evidence about some of the factors would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Likewise, a lack of evidence on one factor cannot be used as if it were clear and convincing evidence supporting a termination finding. *In re E.N.C.*, 384 S.W.3d at 808.

In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the child's best interest; in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *Id.*

Our "best interest" analysis is not limited to these *Holley* factors; other factors may be considered. *Holley*, 544 S.W.2d 372.

When the court considers factors related to the child's best interest, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, the court and the Department should consider: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and

42

ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* at § 263.307(b).

A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.–San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

### 1. Children's desires

When the burn incident occurred, Jim was seven years old, and Jake was six. The trial took place 21 months later, when Jim was nine and Jake was eight.

It was undisputed that the children love their mother and wish to live with her. Edwards agreed that there is "no question" that the boys miss and "will always love their mother." Edwards testified that, when Pam visited with the boys shortly before trial, they were happy to see her, she was excited to see them, and they all hugged each other. Edwards saw nothing in the visit that concerned her about their relationship.

Roy, the Department supervisor who made the decision to seek termination instead of family reunification, never read the boys' therapy notes to determine the boys' desire. Roy never spoke to the boys at all, ever.

The Department argues that this factor is "neutral" and does not weigh in favor of Pam because of the "young age" of the children. The Department relies on *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) for this proposition. But that case involved a one year old. These boys are eight and nine years old. As the Department essentially conceded at oral argument, they are old enough to express their desires. *See In re A.A.Z.*, No. 14-17-00276-CV, 2017 WL 3612259, at *10 (Tex. App.—Houston [14th Dist.] Aug. 22, 2017, pet. denied) (mem. op.) (considering desires of eight year old). And they have done so clearly and emphatically, repeatedly telling the Department caseworkers that they love their mother and want to return home to her.

This factor weighs strongly in Pam's favor.

### 2. Children's present and future physical and emotional needs and danger

The Department argues that the evidence supporting the predicate findings also supports a best-interest finding against Pam under this factor.

While Pam denied intentionally harming Jim, the factfinder reasonably could have disbelieved Pam's denial. A parent's past dangerous behavior indicates the potential for future dangerous behavior. *See In re W.J.B.*, Nos. 01-15-00802-

44

CV & 01-15-00803-CV, 2016 WL 1267847, at *9 (Tex. App.—Houston [1st Dist.] mar. 31, 2016, no pet.) (mem. op.) (stating that "evidence of past misconduct or neglect can be used to measure a parent's future conduct."); *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied) (factfinder may infer that past endangering conduct may recur in future if child is returned to parent). But there was other evidence mitigating the likelihood of future harm. Edwards agreed that the therapy Pam received addressed alternative, effective ways to discipline. Lezak discharged Pam from therapy, which Mendez agreed signified that, in Lezak's opinion, Pam had "satisfactorily completed all of her therapy." While testifying, Pam demonstrated memory of the parenting techniques she had learned, which increases the likelihood she would incorporate appropriate parenting techniques in the future.

Pam completed all of the classes and therapy the Department requested. If it determined that additional classes or therapy were needed to develop Pam's abilities to provide for her children's emotional and physical needs adequately, it could have assigned more services. It neither assigned more tasks nor told Pam that she failed to meet its expectations. In fact, it did the opposite: the Department informed Pam and the trial court on several occasions that Pam was successful in completing her services.

There was evidence that these services taught Pam protective parenting techniques, proper disciplinary techniques, anger management skills, and coping skills. Pam testified that she learned additional, helpful concepts about parenting in her parenting classes and therapy. These new skills are reasonably likely to bolster Pam's ability to provide for the boys' physical and emotional needs in the future.

Pam provided food, clothing, shelter, education, and love to the boys. At the time of trial, Pam had been employed 18 months. Additionally, Pam was furthering her education beyond her high school degree. This evidence supports a conclusion that Pam is able to provide for the boys' present and future physical needs.

There was undisputed evidence that the boys love their mother and want to be with her. This evidence supports a conclusion that Pam can and will provide for their emotional needs as well. *See Yonko v. Dep't of Fam. and Protective Servs.*, 196 S.W.3d 236, 245 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (similarly considering child's wishes in analysis of present and future emotional needs).

The Department argues Pam continues to be a danger to the boys. The Department focuses on the testimony of Edwards, Johnson, and Roy that Pam did not "successfully complete" her services because she did not admit to the investigating officer, criminal courts, therapist, or Department workers that she intentionally placed Jim's hands near the heat of the hair straightener. Edwards

testified that Pam needed to "confess" to successfully remedy the Department's concerns.

We reject the Department's position for at least four reasons. First, given the importance of a parent's constitutional rights and the necessity of clear and convincing evidence to terminate those rights, the Department cannot keep a parent in the dark about the need to "confess" in order to reunite with their children. If a parent's confession is critical for the Department to adequately provide the parent specific training to avoid similar misconduct in the future, the Department should inform the parent. After all, why make the parent take parenting and therapy classes if the Department will recommend termination in the absence of a confession? Second, the Department not only kept Pam in the dark, it affirmatively misled her by telling her that she had completed all the assigned tasks. Third, the Department documents admitted into evidence state that the services were completed. And finally, the right to remain silent is a right of constitutional dimension, as is the right to the "companionship, care, custody, and management" of one's child. If the Department is going to require a parent to sacrifice one constitutional right for another, it should at least inform the parent of this requirement and explore whether there are reasonable steps that can be taken to avoid this constitutional dilemma for a parent. Here, for example, the criminal case reached an agreed disposition months before the trial began in earnest. The

Department during those months could have re-interviewed Pam, sent her for additional therapy or parenting classes, or itself met with the therapist. It also could have called her defense lawyer. The record lacks evidence that it did anything in light of this new development which, according to Pam, freed her to discuss more openly the events surrounding Jim's burns.

In considering the boys' emotional needs, we also note that there was evidence that the boys were demonstrating inappropriate behaviors while in foster care. The parties dispute the source of these behaviors and whether they evidence a decline in the boys' emotional well-being while in foster care. The Department asserts that there had been abuse in the home before the boys' removal and that the abuse accounts for the behavioral problems seen after removal. Pam argues that there is no evidence of behavioral problems at home before the boys' removal. The only evidence we locate of behavioral problems before removal is a Department permanency planning form with a handwritten notation that the "boys did not have behavioral issues at home before coming into custody; however, the previous school reported some behavior issues."

The Department points to Edwards's and Roy's testimony that this was not the only incident in which the children had been hurt by Pam. Edwards noted a "history of domestic violence," but other evidence confirmed that the earlier incidents were (1) a single incident in which the father allegedly assaulted Pam,

(2) an incident when the father caused property damage in the family home, and (3) an incident when Jim had scratches or a bruise on his face for which the Department has "ruled out" abuse as the cause. Edwards agreed she was not aware of any incidents other than these three. When pressed whether there had been any earlier harm to the boys, Edwards testified that there "possibly could have been" but the Department was "unable to determine." She continued, "So, it could have happened; it couldn't have. There was not enough evidence to give it a reason to believe disposition." She agreed the actual disposition was that abuse had been "ruled out."

Roy testified that Jake had disclosed during a 4Cs evaluation that he had welts after an episode of physical punishment. The 4Cs report for the children was not admitted into evidence, and there was no other evidence concerning this allegation.

There also were generalized "sexual allegations" without evidence in support of any specific act. Department employees testified that the boys exhibited behaviors that were sexually inappropriate for their young ages. The boys were interviewed but did not disclose anything. Thus, while their behavior in foster care included acting out sexually, no basis for this behavior was determined.

In sum, while allegations of harm were discussed, the trial court received no evidence of other incidents in which Pam was involved in abuse of Jim or Jake

49

beyond the single burn incident and her efforts to hide Jim's injuries and the singular statement attributed to Jake that he once had welts.

In reviewing the boys' present and future physical and emotional needs and dangers, we also note that there was evidence that the children would suffer psychological harm from termination. Roy testified that the boys received therapy for reunification, not termination. She stated that she "can't say" with confidence that the boys ever received any therapy related to termination. She conceded that it was not good for the boys to have had the wrong therapy for the Department's permanency goals. In fact, she stated that she was "sure" it was harmful to them.

Weighing all the evidence, and giving due consideration to the Department's concession that termination without appropriate therapy was harmful to the children whose best interests are the focus of this proceeding, we conclude that this factor favors Pam.

### 3.    Parenting abilities of people seeking custody

Pam demonstrated a history of a bonded, affectionate relationship with her boys. All indications are that the boys love their mother and are comfortable in her care, wishing to be returned to her. The burn incident raises serious questions about Pam's parenting ability at the time of the incident though, and past poor judgment is indicative of the potential for future poor judgment. *See In re W.J.B.*, 2016 WL 1267847, at *9 (stating that "evidence of past misconduct or neglect can be used to

measure a parent's future conduct."). However, in the interim, Pam has completed parenting classes and demonstrated recall of the material taught. She testified that she would alter her disciplinary techniques in the future, ensure she has adequate time to calm before disciplining the children, and incorporate modeling techniques as well. While there cannot be complete assurances that Pam would not falter in her parenting in the future if reunited with the boys, there is significant evidence that she intends to incorporate her new skills and knowledge into her parenting approach.

The Department argues in its brief that Pam has "mental health issues" that counsel against reunification. It points to no evidence in support of this assertion. And such unsubstantiated accusations cannot support the permanent severance of the bond a parent enjoys with her children.

The Department also argues that "the Department could provide a prompt, permanent and safe home for the child with parental termination" as an alternative to family reunification. But the evidence does not support the Department's argument. Edwards testified that she had made no efforts to explore relatives with whom the children might live to allow for a relative placement instead of termination of parental rights. Instead, she envisioned the boys being adopted by a family that had been identified by the Department. Upon further questioning, though, it was established that no one at the Department had spoken directly with

the potential adoptive parents. They were simply the only couple that had come forward and shown an interest in the boys, whom they had never met.

Roy too testified that this couple would provide a safe, loving home for the boys. But, without any evidence that the Department had spoken to the family, that the Department had evaluated their home, or that the prospective adoptive parents had even been introduced to the boys, the testimony was conclusory on the issue of the couple's suitability to parent the boys. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 820 (Tex. 2009) (conclusory opinion testimony is no evidence).

Most of the evidence of this factor weighs in Pam's favor. But we cannot ignore the evidence of Pam's February 2016 abuse of Jim. On balance, we conclude that this factor is neutral.

### 4. Available programs for conservators to promote best interest of children

Edwards testified that Pam completed her services under her Family Services Plan. This evidence strongly suggests that Pam is amenable to availing herself of programs that can improve her parenting.

To the extent Pam did not discuss the specifics of Jim's injury and thereby hampered her effective use of offered programs, there was evidence that her criminal defense attorney had instructed her not to discuss the matter with anyone, including therapists, given the pending criminal charges. The criminal matter has concluded, and Pam finishes the diversion program in July 2018. With that matter

resolved, there is no indication that Pam would be untruthful or evasive in future encounters with therapists and class instructors.

Roy testified that she would have required additional parenting classes and therapy had Pam revealed before trial that she intentionally exposed Jim to the sensation of heat emanating from the hot plates. There is no indication that Pam would reject additional services if offered or required. *See Horvatich v. Tx. Dep't of Protective and Regulatory Servs.*, 78 S.W.3d 594, 603 (Tex. App.—Austin 2002, no pet.) (reversing and remanding parental-termination suit based on factually insufficient evidence of best interest and noting that "passage of time" may afford parent opportunity to better demonstrate parenting ability and any changes were something "Department should take . . . into account on remand.").

This factor strongly favors Pam.

### 5.    Pam's and the Department's plans for the children

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in a child's best interest. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A child's need for permanence, with the establishment of a "stable, permanent home," has been recognized as the paramount consideration in a best-interest determination. *Id.*; *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.— Houston [14th Dist.] 2014, no pet.) ("Stability and permanence are paramount in

the upbringing of children."). Therefore, evidence about the present and future placement is relevant to the factfinder's best-interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

The most recent Department caseworker, Edwards, was assigned to the boys' case in October 2017, which was two months after the termination-of-rights trial began. She testified that the boys were living in a foster home and clarified that it was not a foster-to-adopt home. Edwards testified that the Department would continue to consider relative placements and that a potential adoptive home had been identified two weeks before her testifying date, meaning that it was identified after the trial had begun. Edwards testified that no one at the Department had ever met with the prospective adoptive parents. They were selected because "essentially it was the only family" that had indicated any interest in adopting the boys, who they still had not met. Edwards and Roy spoke positively about the family—stating they "would be a good fit for the children" and would provide Jim and Jake a "safe" and "loving" home—but did so without ever having met the couple. This testimony is conclusory and is no evidence. *See Pollock*, 284 S.W.3d at 820 (conclusory opinion testimony is no evidence).

Pam testified that, until they were removed from the home, Pam had never gone more than 24 hours without seeing either boy. She stated that she completed all of her services quickly, within a matter of months, because she was anxious to

54

have her children returned so they could be together again. Pam further testified that she learned a great deal in her parenting classes and from this incident. If the boys were returned to her care, she would not use similar disciplinary or parenting tactics in the future. Pam had been consistently employed with the same company for eighteen months at the time of trial. She planned to live with the boys in the apartment she leased a few months before trial.

Thus, Pam demonstrated that she had a plan for the boys' future. The Department, on the other hand, had an optimistic vision for the future but no evidence to support a conclusion that its vision would materialize.

This factor weighs in Pam's favor.

### 6. Pam's acts or omissions that may indicate that the existing parent-child relationship is not a proper one and any excuse for those acts or omissions

It is undisputed that Pam caused the burns on Jim's hands. Obviously, burning a child as discipline, to use the words in *Holley*, is "not a proper" aspect of a parent-child relationship. 544 S.W.2d at 371.

Pam testified that she did not clamp the hair straightener down onto Jim's hands, that she did not intend to allow his hands to contact the hot plates, and that she only meant for him to feel the sensation of heat emanating from the device for him to understand that heat can be dangerous. If the trial court did not accept this testimony and concluded that Pam intentionally burned Jim, which the trial court

as factfinder reasonably could have done, it indicates that the parent-child relationship is not appropriate. Pam's handling of the aftermath of the burns is further evidence of an inappropriate parent-child relationship.

Conversely, Pam testified about the specific parenting skills she learned through her services and vowed that she would incorporate those skills in the future. She discussed the vulnerabilities of children that age and their need to be led through their experiences. She noted that children the boys' ages are curious and require guidance. She also learned anger management skills and alternative, healthy ways to discipline children. She specifically discussed what she learned about coping with stress: "I learned how to cope with stress. That means if it is necessary for me to step back, take a deep breath, . . . wait five minutes, it's okay." She learned the importance of modeling good behavior for her children as well. She emphasized the importance of ethics, teaching manners, and stressing academic achievement.[22] Thus, Pam's testimony provided specific evidence of skills she had learned and intended to implement in parenting and disciplining her children in the future.

On balance, this factor favors the Department.

---

[22] She testified, "That means, for instance, since I was in school at the time, I show my grades to my children and told them 'Look, Mommy makes As and Bs. That's why Mommy expects you-guys to make As and Bs.'"

**7. Conclusion based on consideration of evidence and factors**

Pam presented strong evidence that she completed all Plan services assigned to her. There was no evidence to suggest that she would have declined to do more had she been asked. The Department caseworker who was assigned to this family's case the longest—in fact, the full amount of time statutorily provided for resolving conservatorship issues like this—recommended reunification. The Department workers who recommended termination had difficulty establishing a foundation for their opinion due to general unfamiliarity with many aspects of the case, including the underlying file materials, the people involved, and the policies that should guide their evaluations and recommendations. There were insinuations and allegations of harmful conduct directed toward the boys during Department workers' testimony, but the only evidence of harm to the boys was limited to the single burn incident, Pam's efforts to hide it, and Roy's statement that Jake disclosed an episode when physical punishment left welts. Other allegations without evidentiary support do not meet the Department's burden in this best-interest analysis.

One of the Department's primary reasons for recommending that the trial court terminate Pam's parental rights, even though she completed all Plan services, was a distinction between "completed" and "successfully completed" Plan requirement, which the Department workers all agree was never explained to Pam.

At trial, a Department employee expressed a belief that Pam was required to "confess" to injuring her child while a felony criminal charge was pending to be eligible for family reunification. None of the Department employees identified any basis for a confession requirement beyond a Plan requirement that a parent speak honestly with the parent's therapist, and none could testify about what Pam and her therapist (who did not testify) discussed. Nor did any Department employees ever explain to Pam that her invocation of her Fifth Amendment rights could adversely impact their view of whether she had successfully completed parenting training.

Pam testified to lengthy steps she has undertaken to achieve family reunification. The Department argues that the boys were happy in their foster home; however, the last permanency report, dated October 2017—during trial—states that both boys reported "discomfort" in their foster home placement. The boys' strong and repeated desire to be with their mother and the evidence that Pam had a well-bonded relationship with the boys strongly weighs against termination, particularly given their poor experience in foster care and the lack of a fully interviewed, vetted, and approved adoptive family with a permanent home for Jim and Jake. The Department argues that the prospective adoptive parents were approved and that the Department witness who discussed them simply did not have full knowledge at the time she testified. This, though, is not evidence of a permanent, safe, and nurturing home for the boys.

Significantly, Roy, who is the Department supervisor who recommended termination, testified that the therapy the boys received did not address termination and admitted that termination without appropriate therapy is harmful to Jim and Jake.

We have given due consideration to the evidence that the factfinder could have credited in support of its finding that termination of Pam's parental rights to Jim and Jake was in their best interest. We recognize that the factfinder reasonably could have rejected Pam's explanation of the events surrounding Jim's burns, determined that Pam's efforts to conceal the burns further endangered Jim, and discounted the effectiveness of therapy given the obstacles to full discussion of the events during the pendency of the criminal case. Nonetheless, weighing all the evidence and considering all the *Holley* factors, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of Pam's parental rights to Jim and Jake was in their best interest. *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re C.T.E.*, 95 S.W.3d 462, 469 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (concluding evidence was factually insufficient to support best interest finding); *In re K.C.M.*, 4 S.W.3d 392, 399 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (same); *In re S.R.L.*, 243 S.W.3d 232, 236 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (same).

We conclude that there is legally sufficient evidence to support the trial court's ruling on best interest but factually insufficient evidence that termination of Pam's parental rights is in the children's best interest.

We sustain Pam's fourth issue.

## Termination of Father's Parental Rights

The trial court terminated Ron's parental rights after concluding that his conduct met the predicate grounds for termination under Subsections (D), (E), (N), and (O) and that termination was in the boys' best interest.

Subsection (O) provides a predicate for termination of parental rights for failure to comply with the provisions of a court order that specifically establishes the actions necessary for the parent to obtain the return of the child. TEX. FAM. CODE § 161.001(b)(1)(O).

According to Mendez, Ron did not participate in his services. Ron did not dispute this. Instead, he contended that his failure cannot support termination because he did not know about the Department's involvement with his kids, the termination suit, or the court-ordered Family Service Plan. According to Ron, he did not know any of this because he was never served citation in the suit. Ron argued that he could not be expected to have fulfilled the Plan's services without this knowledge.

Ron repeatedly testified that he could not answer questions because he has an extremely faulty memory. He could not recall the number of times he had been arrested, his work history, the address where he lived, or when he last saw his children. He knew it had been at least since the case began in early 2016, which was a year and a half before he testified. He admitted that he received letters from the Department during the pendency of the suit but contended that he had not been served. He stated that he would have remembered being served even though he could remember little else, including arrests.

The trial court took judicial notice of the executed officer's September 30, 2016 return in the court's file. Also in the clerk's record is a May 11, 2016 Status Hearing Order which states that Ron has appeared through his attorney of record and announced ready. Another order dated September 14, 2016, against states that Ron has appeared and announced ready.

Ron's bare denial that he was served in this case is contradicted by the record. Ron appeared in the case more than a year before trial. He failed to complete any of the services detailed in the Plan that had been in place for more than a year.

The record supports the trial court's finding that Ron failed to comply with the provisions of a court order that specifically establishes the actions necessary for

61

the parent to obtain the return of children. *See In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

At the time of trial, Ron had not seen his children in over a year and, by all accounts, had not checked on their well-being or assisted in finding a suitable, permanent home for them. There is ample evidence that termination of Ron's parental rights is in the best interest of Jim and Jake. *See id.* (stating that evidence parent failed to complete all tasks and services required in Plan supports finding that termination is in child's best interest).

We overrule Ron's fourth and fifth issue. We do not reach his other issues challenging the sufficiency of the evidence as to the remaining predicate findings.

### Managing Conservator

Pam also challenges the legal and factual sufficiency of the evidence supporting the appointment of the Department as the children's sole managing conservator. She asks that she be appointed sole managing conservator.

A managing conservator is authorized to determine the child's primary residence. *See Phillips v. Beaber*, 995 S.W.2d 655, 660 (Tex. 1999); *In re C.A.M.M.*, 243 S.W.3d 211, 215 n.7 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also* TEX. FAM. CODE § 153.132 (listing "rights and duties" of parent appointed sole managing conservator), § 153.371 (listing "rights and duties" of non-parent appointed as sole managing conservator). The managing conservator

has nearly sole authority to make decisions for the child. *See* TEX. FAM. CODE §§ 153.132(1)–(9), 153.371(1)–(11); *see also In re R.L.*, No. 01-16-00851-CV, 2017 WL 1496955, at *13 (Tex. App.—Houston [1st Dist.] Apr. 21, 2017, no pet.) (mem. op.); *In re N.L.D.*, 412 S.W.3d 810, 816 (Tex. App.—Texarkana 2013, no pet.) ("Conservatorship of a child includes the day-to-day management of the child.").

The termination of parental rights and the appointment of a non-parent as sole managing conservator are two distinct issues, requiring different elements, different standards of proof, and different standards of review. *Compare* TEX. FAM. CODE § 161.001 *with id.* § 153.131(a); *see In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007); *Earvin v. Dep't. of Family & Protective Servs.*, 229 S.W .3d 345, 351 (Tex. App.—Houston [1st Dist.] 2007, no pet.). A rebuttable presumption exists that it is in a child's best interest for his parents to be named his joint managing conservators. TEX. FAM. CODE § 153.131(b).

Section 153.131's parental presumption is removed when there is a "finding of a history of family violence involving the parents of a child." *Id.* § 153.131(b); *see In re J.J.G.*, 540 S.W.3d 44, 56 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The presumption may also be rebutted by showing that appointment of a parent would "significantly impair the child's physical health or emotional development." TEX. FAM. CODE § 153.131(a); *In re J.A.J.*, 243 S.W.3d at 616. An opposite

rebuttable presumption from the normal presumption in favor of parents occurs so that courts are to presume that appointment of a parent as the sole managing conservator is not in the child's best interest when credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by that parent directed against the other parent, a spouse, or a child. TEX. FAM. CODE § 153.004(b); *In re J.J.G.*, 540 S.W.3d at 56.

Regardless of any presumptions, the primary consideration in conservatorship determinations should always be the child's "best interest." TEX. FAM. CODE § 153.002; *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). In determining the child's best interest for the appointment of a managing conservator, the court must consider both the Section 263.307 factors and the *Holley* factors described above. *In re A.C.*, 394 S.W.3d at 644.

Unlike the standard of proof for termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need only be established by a preponderance of the evidence. TEX. FAM. CODE § 105.005; *In re J.A.J.*, 243 S.W.3d at 616. Likewise, the standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for termination of parental rights. *In re J.A.J.*, 243 S.W.3d at 616; *In re A.C.*, 394 S.W.3d at 644. We review a trial court's appointment of a non-parent as

64

sole managing conservator for abuse of discretion only. *In re J.J.G.*, 540 S.W.3d at 55.

Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion. *Id.* When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in its application of discretion. *Id.* We reverse the trial court's appointment of a non-parent as sole managing conservator only if we determine that it is arbitrary or unreasonable. *Id.* "Because different standards apply, evidentiary review that results in reversal of a termination order may not yield the same result for a conservatorship appointment." *In re J.A.J.*, 243 S.W.3d at 616.

This Court has previously held that even when there was factually insufficient evidence to support the trial court's finding that termination of parental rights was in the children's best interest, the trial court may nevertheless not abuse its discretion in appointing the Department as sole managing conservator. *In re R.W.*, No. 01–11–00023–CV, 2011 WL 2436541, at *13 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.); *cf. In re J.A.J.*, 243 S.W.3d at 616

(recognizing that "the evidence supporting termination under ... section 161.001(1) could be insufficient, and at the same time still support the determination that appointment of a parent as conservator would impair the child's physical health or emotional development . . . ."); *In re J.J.G.*, 540 S.W.3d at 61 (holding that trial court could deny termination request but still "determine that a preponderance of that same evidence established that appointing either parent as conservator would impair the children's physical health or emotional development").

We conclude similarly here. The evidence is factually insufficient to support the trial court's finding that termination of Pam's parental rights is in the best interest of Jim and Jake. The evidence contrary to the factfinder's ultimate best-interest conclusion includes the children's desires, the children's prior relationship with their mother, the children's reported anxiety from being separated from their mother, Pam's compliance with everything in the Plan (though, the Department contends, not "successful completion"), Pam's gainful employment, Pam's new apartment lease, Mendez's recommendation, who at the time of her involvement in the case favored family reunification, the therapist's opinion in favor of reunification, the absence of any foster home where the boys feel loved or have bonded or any potential adoptive family that has completed screening by the Department, and the absence of any evidence of mental illness and drug and alcohol abuse. But the disputed evidence that a reasonable factfinder could have

credited in favor of termination and the best interest finding specifically, including Pam's role in burning Jim, her efforts to conceal the burns, and her lack of full engagement in the services she completed, is sufficient under the lesser standard to support naming the Department as the boys' sole managing conservator. *Id.*

The same reasons that we hold the evidence to be *legally* sufficient to show that termination was in the children's best interest also supports a holding that naming the Department as sole managing conservator was not an abuse of discretion. There was evidence from which the trial court could have concluded that Pam intentionally injured Jim and that she attempted to cover it up. In light of this evidence, the trial court's ruling on the issue of sole managing conservatorship was not arbitrary and capricious; thus, it was not an abuse of discretion.

We were told in oral argument that Jim and Jake are now living with a relative, and therefore the circumstances may have materially and substantially changed since the 2017 order terminating parental rights and appointing the Department as the sole managing conservator for the children. That is a matter for the trial court to consider on remand.

## Conclusion

We affirm the trial court's order terminating Ron's parental rights. We overrule Pam's challenge to the trial court's order appointing the Department as the children's managing conservator, although we recognize, as the parties stated

67

during oral argument, that the trial court could reconsider that issue as well as whether Pam should have visitation rights now that additional time has passed that may aid the court in determining the children's best interest. We conclude that there is legally and factually sufficient evidence of the predicate finding against Pam under Subsection (E), that there is legally sufficient evidence that termination of her parental rights is in the children's best interest, but that there is factually insufficient evidence that it is in their best interest. Accordingly, we reverse the trial court's order terminating Pam's parental rights for factually insufficient evidence that termination is in the children's best interest. We remand that portion of the suit for additional proceedings consistent with this opinion.

Harvey Brown
Justice

Panel consists of Justices Higley, Brown, and Caughey.